1  JS-6    'O'
2
3
4
5
6
7

8      IN THE UNITED STATES DISTRICT COURT
9      FOR THE CENTRAL DISTRICT OF CALIFORNIA
10

11  AUDIGIER BRAND                          Case No. 2:12-cv-05687-CAS (RZ)
12  MANAGEMENT GROUP, LLC, a
    California limited liability company,  **JUDGMENT**
13              Plaintiff,
14  vs.
15  RHITA PEREZ, a/k/a RUTH
    PEREZ, a/k/a RUTH KRAIF,
16  an individual,
17              Defendant.
18
19
20      This action brought by plaintiff Audigier Brand Management Group, LLC
21  ("ABMG") against defendant Rhita Perez, a/k/a Ruth Perez, a/k/a Ruth Kraif
22  ("Perez") is presently set for trial on March 25, 2014.  Defendant Perez, who
23  knowingly and voluntarily submitted to the jurisdiction of this Court and the
24  application of United States and California law to the present action, has
25  determined that she does not intend to continue to defend this case, and has
26  stipulated to judgment in favor of ABMG on ABMG's Claim 3 for declaratory
27  relief.  The parties agree that Claims 1-2, and Claims 4-13 in ABMG's complaint,
28  Dkt. No. 1, are moot, and should be dismissed with prejudice.

1     Judgment is hereby entered in favor of ABMG on its Claim 3. Ms. Perez is
2  personally liable as an alter ego for the obligations of Mood Signatures, LLC
3  ("Mood Signatures"), a limited liability company of which Ms. Perez was the sole
4  member, as those obligations have been determined in the Final Award, dated
5  December 13, 2013, issued in the arbitration proceeding entitled *Audigier Brand
6  Management Group, LLC v. Mood Signatures, LLC*, American Arbitration
7  Association Case No. 72 130 Y 00117 12 SIM. Pursuant to said Final Award,
8  Mood Signatures, LLC's, and thus Ms. Perez's, obligations to ABMG presently
9  total $1,096,769.49, plus interest accruing from and after December 13, 2013 on the
10 sum of $975,160.89 as provided by law. A true and correct copy of the Final
11 Award is attached hereto as Exhibit 1 and is incorporated by reference herein as
12 though fully set forth.
13    Claims 1-2 and Claims 4-13 alleged in ABMG's Complaint in this action are
14 hereby dismissed with prejudice.
15    Each party shall bear its own costs.
16    This Court shall retain jurisdiction over Ms. Perez for the purpose of making
17 any further orders necessary or proper for the construction or modification of the
18 Judgment and for the enforcement or compliance with or punishment of violations
19 of the Judgment.

21    IT IS SO ORDERED, ADJUDGED AND DECREED.

23 February 6, 2014

*Christina A. Snyder*

    HON. CHRISTINA A. SNYDER
    UNITED STATES DISTRICT COURT JUDGE

# EXHIBIT 1

AMERICAN ARBITRATION ASSOCIATION
Commercial Arbitration Tribunal

| | |
|---|---|
| In the Matter of Arbitration Between:<br><br>AUDIGIER BRAND MANAGEMENT GROUP, LLC.<br>　　　　Claimant,<br>vs.<br>MOOD SIGNATURES, LLC and RUTH PEREZ,<br>　　　　Respondents.<br><br>AND RELATED COUNTERCLAIMS | Case No. 72 130 Y 00117 12 SIM |

## FINAL ARBITRATION AWARD

THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the license agreement between the parties dated as of February 1, 2009, and having been duly sworn, and having duly heard the proofs and allegations of the parties, hereby issues this FINAL ARBITRATION AWARD as follows:

1.  The parties agreed that this dispute is arbitrable pursuant to paragraph 21 of the Trademark License Agreement dated as of February 1, 2009 between Claimant and Counter-Respondent Audigier Brand Management, LLC ("Claimant" or "ABMG") and Respondent and Counter-Claimant Mood Signatures, LLC ("Respondent" or "Mood"). The parties also agreed that the Commercial Arbitration Rules of the American Arbitration Association ("AAA") apply in this matter.

2.  The applicable pleadings are Claimant's Amended Statement of Claims dated July 23, 2012, Respondent's Response to the statement of claims dated August 6, 2012 (which included counterclaims), and Claimant's answer to the counterclaims dated September 14, 2012.

3.  The parties, by agreement, conducted discovery prior to the merits hearing, including mutual production of documents, interrogatories and responses thereto, and depositions of certain witnesses. The merits hearing was held on April 18 and 19, and May 21, 22, 23 and 24, 2013. By agreement of the parties, the hearings were held at the offices of Claimant's counsel at 2049 Century Park East, 7th Floor, Los Angeles, California 90067. At the hearing Claimant was represented by James Turken, Esq., and Fawn Schanz, Esq., and Respondent was represented by James Smith, Esq., and Judd Serotta, Esq. At the hearing, the parties introduced documentary evidence and the testimony of Rhita Perez, Hubert Guez, Fiona Nottingham and Serge Kraif. Ms. Perez testified in the French language and her testimony was translated into English by an interpreter agreed upon by the parties. All the other witnesses testified in English. Following the hearing, the parties submitted certain additional documentary evidence, which has

been considered by the arbitrator. The parties then submitted post-hearing briefs, and counsel gave oral arguments on August 1, 2013, whereupon the hearing was closed. The parties agreed to extend the time for issuance of the award to September 17, 2013, to be followed by an application for an award of attorneys' fees and costs to the prevailing party. The arbitrator issued an Interim Arbitration Award dated September 16, 2013, deciding all issues except for an award of attorneys' fees and costs and an allocation of the fees and expenses of the AAA and the arbitrator. The findings of the Interim Award are reaffirmed and are set forth verbatim below.

4. The arbitrator finds that Mood entered into and is bound by the Trademark License Agreement dated as of February 1, 2009, and that the agreement was not induced by fraud or mistake.

5. Respondent breached the License Agreement by, among other things, failing to report and pay earned royalties and minimum guaranteed royalties as required by the Agreement. Claimant ABMG is entitled to recover, as damages resulting from Respondent's breaches of the Agreement, the amount of $648,935.89.

6. The arbitrator finds in favor of Respondent Mood, and against Claimant ABMG, on ABMG's trademark infringement claim.

7. The arbitrator finds in favor ABMG and against Mood on Mood's counterclaim.

8. Claimant ABMG is the prevailing party in this arbitration and, pursuant to paragraph 21.2 of the Trademark License Agreement, ABMG is entitled to recover its reasonable attorneys' fees and costs incurred herein. The parties stipulated for a briefing schedule on Claimant's application for an award of attorneys' fees and costs, and Claimant timely filed its application on October 15, 2013. The parties stipulated to further extensions of the briefing schedule on Claimant's application. On December 4, 2013, counsel advised the arbitrator that the parties had stipulated to an award to Claimant of attorneys' fees and costs in the amount of $325,000. Pursuant to this stipulation, Claimant shall recover attorneys' fees and costs from Respondent in the amount of $325,000.

9. Pursuant to paragraph 21.2 of the License Agreement (Ex. 5), Section 3289(b) of the Civil Code and Section 685.010 of the Code of Civil Procedure, the amount awarded pursuant to paragraph 5 above shall bear interest at a rate of 10% per annum from and after January 29, 2012 until the amount of this award is paid in full. The amount of such interest due and payable as of the date hereof is $121,608.60.

10. The stipulated amount of attorneys' fees and costs of $325,000 as reflected in paragraph 8 hereof, includes all fees and expenses of the AAA and all fees and expenses of the arbitrator except for the arbitrator's fees of $2,450.00 reflected in his invoice dated December 6, 2013. Respondent shall reimburse Claimant ABMG the sum of $1,225.00, representing that portion of the final invoice amount in excess of the apportioned costs previously incurred by Claimant.

11. The total amount awarded to Claimant by this award is $1,096,769.49. The amounts awarded pursuant to paragraphs 5, 8 and 10 hereof shall bear interest from and after the date of this award as provided by law.

12. This award is intended to determine all claims, defenses and counterclaims submitted for decision. Any claim or defense not specifically mentioned herein is hereby denied.

13. The arbitrator's reasons for this award are set forth in the Statement of Reasons below.

14. Rhita Perez, Hubert Guez, and Christian Audigier individually, were named as parties to this arbitration, but were voluntarily dismissed from the arbitration without prejudice. The arbitrator has been advised that ABMG has filed a lawsuit in federal court against Rhita Perez, owner of Respondent Mood, alleging that she is personally liable as the alter ego of Mood for the alleged liabilities of Mood which are the subject of this arbitration. This award is not intended to determine any issues concerning Ms. Perez's alleged individual liability. Similarly, this award does not determine any claims against Mr. Guez or Mr. Audigier.

## STATEMENT OF REASONS

### I. Factual Background

Claimant ABMG is engaged in the business of licensing the sale of products under the Christian Audigier trademark and brand. Respondent Mood is a California limited liability company, owned and controlled by Rhita Perez ("Perez"),[1] a resident of Paris, France.

In the mid-2000s, Ms. Perez and her husband, Serge Kraif, became friends of Hubert Guez. Both Mr. Kraif and Mr. Guez had been successful executives in the apparel industry. In the summer of 2008, while Perez and Kraif were visiting Guez in Los Angeles, they discussed the possibility of Perez obtaining a license to manufacture and sell velour jogging apparel under the Christian Audigier trademark.

Guez, through a friend Gerard Medina, arranged for a meeting between Perez and Christian Audigier, at which they discussed a possible license of the Audigier brand to Perez for velour jogging apparel. Perez had worked in sales and design in the apparel industry, including work for a successful Kraif-owned company, Compagnie de Californie, but she had not previously owned or operated her own company. At the time, clothing and other products sold under the Christian Audigier name were very popular on a worldwide basis. Tr. 64:17-23

In October 2008, Guez became Chief Executive Officer of ABMG. In November 2008, Perez and Kraif returned from Paris to Los Angeles, and serious discussions about a license agreement ensued. Ultimately, in late 2008, Mood entered into a 5-year license agreement with ABMG to sell velour jogging apparel under the Christian Audigier brand. There was conflicting testimony about the negotiations of the license and what written agreements were executed (See Part IIA below). However, it is undisputed that in 2009 Mood commenced the business of selling velour jogging apparel under the Audigier brand as a licensee of ABMG.

Although Mood was a California limited liability company, Ms. Perez conducted its operations principally from Paris, France, where she resided. Mood had goods manufactured in

---

[1] Ms. Perez is also known as "Ruth Perez."

53105728.1 - 3 -

China, and sold its products throughout the world. Mood achieved some success, with revenues of nearly $1 million in 2009 and over $1.5 million in 2010. Exs. 45, 47. However, by 2011 Mood's sales had fallen off dramatically and Mood was losing money. Mood effectively stopped selling its products sometime in 2012.

In early 2012, ABMG demanded that Mood pay certain minimum guaranteed royalties allegedly due under the license agreement. Exs. 40, 41. Mood denied any liability, and this arbitration ensued. The parties contentions are discussed below.

I.      **ABMG's Breach of Contract Claim**

    A.      **The Agreement**

First, it is necessary to determine what agreement was entered into between Mood and ABMG. Certain facts are undisputed: In November 2008 Perez, on behalf of Mood, signed a three-page Schedule, summarizing important terms of the license agreement. Ex. 6. Perez also signed a signature page for a long-form license agreement. Ex. 5. At the time, Perez knew she was signing a contract. Tr. 351:3-6. These documents were in English, and Perez does not read English. Guez, who is fluent in French, explained the license to her in a "whiteboard" presentation, lasting at least 1 and ½ hours, at Guez's office at ABMG.

From this starting point, the parties presented drastically different versions of the facts. Guez testified that he explained all of the provisions of the long-form license agreement (Ex. 5) to Perez and Kraif in great detail in the French language at a meeting in his office. Guez testified that ultimately Perez received and signed both the 3-page Schedule (Ex. 6) and the long-form license agreement (Ex. 5). Perez, although acknowledging that she met with Guez in his office, listened to his explanation of the license and signed the 3-page summary, testified that she never saw the long-form license agreement. Perez testified she met alone with Guez, without Kraif, and that Guez made a number of representations that are not in either version of the license agreement, including assurances about the sales that Mood would achieve, that ABMG's licensees were "like a family" and that if the business did not work out she could return the license to ABMG at any time. Guez testified he explained the contractual provisions regarding minimum guaranteed royalties. Perez testified Guez never mentioned minimum guaranteed royalties.

This conflicting testimony raises a number of issues. First, is Mood bound by the terms of the written license agreements? Second, if Mood is bound by a written license agreement, is it Ex. 5, Ex. 6, or both? Did Guez induce Mood to enter into the license agreements by fraud?

Although it is a close question, the arbitrator finds that Mood executed and is bound by both the Schedule and the long form license agreement (referred to herein collectively as the "License Agreement"). Perez testified that Guez went over the terms of the license "point by point" for at least one and one-half hours. This was longer than would have been needed to explain the Schedule. There was no advantage to be gained by Guez by "explaining" the Schedule but not the long-form agreement. The two agreements are substantially consistent. The Schedule itself makes clear that is contemplates a separate license agreement and, if there is any conflict, that agreement controls. Both agreements contain provisions describing the

minimum guaranteed royalties. Also, Perez's contention that she never saw the long form agreement was made relatively late in these proceedings. For example, in its detailed response dated August 6, 2012 to ABMG's statement of claims (the "Response"), Mood raised multiple defenses but did not allege that it never entered into and is not bound by the long form license agreement. Throughout the Response, Mood refers to the "License Agreement" without distinguishing between the Schedule and the long-form agreement. Mood pointed out, correctly, that there was no documentary evidence showing delivery of the long-form agreement to Mood and that in 2011 Fiona Nottingham, a Mood employee, looked in the files of the Mood office in Beverly Hills and found only the Schedule, not the long-form agreement. Considering all of the evidence, however, the arbitrator believes it is more likely than not that Guez explained the long-form agreement to Perez and that she signed both Exhibits 5 and 6.

Mood contends that Perez was unaware of, and never agreed to, any obligation to pay minimum guaranteed royalties. The arbitrator finds that this contention is not supported by the evidence. Both the long-form agreement and the Schedule clearly spell out Mood's obligations to pay minimum guaranteed royalties. Indeed, paragraph 5.11 of the Schedule (headed "GUARANTEED ROYALTIES") contains a schedule of guaranteed royalties for each of the five years, with the asterisked provision:

> "*Guaranteed Royalties for Year 1 shall be waived. Guaranteed Royalties* for each of the subsequent License Years (as defined in the Agreement) shall be payable in four (4) equal installments, each equal to 25% of the *Guaranteed royalties* for the License Year in question, payable at the beginning of each License quarter (as defined in the Agreement) of each License year." (Emphasis added)

Perez testified to a number of the terms of the License Agreement as explained by Guez. To sustain Mood's position, it would be necessary to find that Guez, who was friendly to both Perez and Kraif at the time, explained the *other* provisions of the Schedule, but failed to mention the provision regarding guaranteed minimum royalties. This finding, in the arbitrator's view, is not supported by the evidence. The fact that the first year guaranteed royalty was "waived" and that the upfront license fee was also waived (Ex. 6, ¶ 5.14), suggests that there was a discussion, as testified by Guez, about minimum guaranteed royalties. The arbitrator also finds that Kraif, who was highly experienced in license agreement negotiations and fully understood the risks of such agreement, was involved in the negotiations of the License Agreement. He admittedly negotiated an extension of the agreement's commencement date, thereby extending the time when guaranteed royalties would become due. Tr. 1461:4-17. Kraif also participated in discussions about the waiver of the $200,000 license fee (key money) and the first year guaranteed royalty.[2] Kraif also testified that he gave Perez $500,000 to start the business. Tr. 1479.

---

[2] There was conflicting and confusing testimony about a supposed side oral agreement respecting the $300,000 amount. As ABMG points out, it is not seeking to enforce any such side agreement and the arbitrator finds it unnecessary to determine which witnesses' version of the alleged agreement is to be believed. It is important to note, however, that in a March 3, 2009 email to Guez (Ex. 125), Kraif acknowledged being at a meeting in Guez's office at which the $300,000 amount was discussed in the presence of Perez. Tr. 1455. Perez confirmed that Guez told her would "talk to Serge" about the advance royalties. Tr. 326:5-8. This is further evidence that Kraif participated in negotiations of the License Agreement, and that guaranteed royalties were discussed at the outset.

Mood seeks to avoid the impact of the License Agreement's language by claiming fraud in the execution, citing *Rosenthal v. Great Western Fin. Securities Corp.*, 14 Cal 4th 394 (1996). In *Rosenthal*, certain plaintiffs adequately pleaded fraud in the execution of certain mutual fund investments by alleging they were illiterate in English, that the representatives of the securities firm purported to recite what the documents said, but instead misrepresented the contents of the documents, so that the plaintiffs did not actually know what they were signing. The court acknowledged that there were factual issues regarding these allegations that would have to be tried.

The arbitrator believes that *Rosenthal* is distinguishable. Accepting that Perez does not speak or read English and relied on Guez's explanation of License Agreement, the arbitrator finds that Guez did not misrepresent or conceal the essential terms of the License Agreement. At the time, Perez was Guez's friend and her husband, Kraif, was a *very* close friend of Guez's. Guez's later falling out with Kraif over a joint e*Trade account had not yet occurred, and he had no motive to defraud or trick Perez.[3] Moreover, unlike the *Rosenthal* plaintiffs, Perez is a highly intelligent and articulate person, and she was accompanied in the license negotiation process by Kraif, who was a highly sophisticated businessman with extensive experience in the apparel industry.[4] The *Rosenthal* Court stated that where a party has a "reasonable opportunity" to know the essential terms of the contract and fails to learn the nature of the document she signs, that precludes a finding that the contract is void for fraud in the execution. 14 Cal. 4th at 422-23. Perez had ample opportunity to review the License Agreement with bilingual sources—including her husband, Kraif, and her immigration attorney, Gerard Soussan. The license was discussed over a period of weeks, if not months, and went through at least two drafts. Clearly, Perez had a reasonable opportunity to learn the terms of the contract, and the License Agreement may not be avoided on a theory of fraud in the execution.

Mood contends that the parties "course of conduct" vindicates Perez's version of her discussions with Guez in November 2008 and that the arbitrator should rely on the parties' course of conduct before any dispute arose in interpreting the agreement, especially as it relates to minimum guaranteed royalties. The arbitrator agrees that the parties' course of conduct is relevant to contractual interpretation. *U.S. Cellular Investment Co v. GTE Mobilnet, Inc.*, 281 F. 3d 929, 937-938 (9th Cir. 2002). However, the evidence of the parties' conduct is equivocal at best, and does not overcome the clear language of the License Agreement respecting minimum guaranteed royalties. Mood relies on the delay by ABMG in asserting a right to minimum royalties. However, in view of the first-year waiver, no minimum royalties came due until first of quarter of year 2 ending October 31, 2010. While there was no *immediate* demand for payment of such royalties in that quarter, there were references to minimum royalties in emails exchanged between Mood (through Fiona Nottingham) and ABMG (through Gwendolyn Soldwisch) beginning in March 2011. Exs. 629, 630, 636, 37.[5] Fiona informed Perez of

---

[3] Mood emphasizes that after the License Agreement was entered into Guez continued to support Perez in her effort to establish the new business. Mood Post-Hearing Brief at 6-7 and evidence cited therein.

[4] Kraif testified that he believed the license deal was "crazy" and warned Perez to avoid it, based on his experience of the business risks licensees in this industry assume. Tr. 1396.

[5] Gwendolyn also brought the subject of minimum guaranteed royalties to the attention of Mood's accountant, Blaise Abergel, in March 2011. Ex. 92.

ABMG's position that minimum royalties were owed. Exs. 84, 85. Minimum guaranteed royalties were a line item on certain royalty report forms submitted by Mood to ABGM. Exs. 10, 11, 24, 25. Notwithstanding that by March 2011, at the latest, Perez knew that ABMG was seeking to collect guaranteed royalties, there is no evidence that she communicated any disagreement with this position to ABMG. When Guez demanded payment of minimum guaranteed royalties in a December 2, 2011, email, Perez merely expressed regret that Mood could not pay them because of its poor financial condition. Ex. 39. These communications between the parties are consistent with an obligation by Mood to pay guaranteed royalties and, at a minimum, are insufficient to show the parties' had an understanding contrary to the terms of the License Agreement.

### B. Alleged Breaches by Mood

ABMG alleges that Mood breached the License Agreement by failing to pay minimum guaranteed royalties and by failing to account for and pay earned royalties on sales outside the United States, including but not limited to sales to an affiliated corporation formed by Perez, Mood Coutures ("Coutures"), based in France.

Mood admits that it did not pay minimum guaranteed royalties. Its defense to nonpayment, is essentially that Mood's agreement with ABGM did not require any such royalties or that Mood was defrauded into signing the License Agreement. These defenses are discussed in Part II A above. Because the arbitrator finds that the License Agreement required payment of minimum royalties, Mood breached the agreement.

Mood also admits that it did not account for or pay royalties on sales of Audigier-branded products outside the United States, including sales by Mood to Coutures. Tr. 72:23-73:2; Tr. 83:18-84:1. Mood admits that it had a worldwide Audigier license, but contends it had an oral understanding with Guez that no royalties needed to be paid on sales outside the United States. Guez denies that there was such an agreement. Tr. 709:5-10.

Perez testified that in late 2009 she met with Guez in Paris and told Guez she had "double expenses" because she had decided not to move, at least in the short run, to Los Angeles. Her U.S. visa had not been granted in time and she had decided to enroll her children in schools in France for the 2009-2010 school year. Perez also testified that she told Guez that she couldn't report royalties on her sales in France because she didn't have the Pacific Apparel accounting system that was being used by Mood in the U.S. Tr. 144:17-25; 157:7-23. The arbitrator finds that these explanations for not paying royalties on international sales are not persuasive, and that the evidence does not support an agreement between ABMG and Mood that such royalties were not owed. The incremental expenses of operating "two offices" were not substantial. Mood had only one part-time employee in California, and its office was at the Perez/Kraif apartment in Beverly Hills. The explanation that somehow Mood could not pay royalties on its international sales because of the use of the Pacific Apparel system in the U.S. does not make sense. Even assuming the Pacific Apparel system was not available in France and that ABMG insisted on use of the Pacific Apparel system in the U.S. (both of which propositions are questionable based on the evidence), there was nothing to prevent Mood from submitting royalty reports containing all of its sales. Indeed, Mood insists it sent records showing *all* of its sales to its U.S. accountant, Blaise Abergel, for year-end accounting and tax purposes. Finally, there is no documentation,

including emails, memorializing any agreement that Mood did not have to pay royalties on international sales. It would have been highly unusual and contrary to Guez's duties as CEO of ABMG, for a Licensor to allow sales of licensed products free of any royalty obligation.

Perez also testified that she was advised by a French lawyer[6] that it was "illegal" to operate a U.S. company, Mood, from France, and that she had to set up a French company. Tr. 253:2-3. She says she told Guez that should was going to start a French company "to legalize this whole situation," but "didn't give him all the details exactly." Tr. 433:14-21. Even if Mood's operations required formation of a French affiliate to company with French law, that does not explain why Mood could not report and pay royalties on sales of Audigier-branded merchandise to, or through, its French affiliate. The arbitrator cannot accept that any need to form a French company excused Mood's royalty obligations, or that Guez entered into a binding oral agreement to that effect.

### C. Other Mood Defenses

Mood contends that ABMG materially breached the License Agreement by (i) failing or delaying to provide artwork and logos for use in products designed by Mood, and (ii) ceasing to attend trade shows to promote Audigier products, including those covered by the License Agreement, (iii) stopping other publicity and advertising of the Audigier brand, and (iv) curtailing its own ordering of Mood velour products in 2011. Mood contends that these alleged breaches should excuse Mood from its minimum guaranteed royalty obligations. The arbitrator disagrees.

The evidence showed that the designs of Mood's velour products were done by Mood from the outset of the license. There is no provision in the License Agreement obligating ABMG to produce and provide designs, logos or artwork for the licensed products. ABMG did provide logos for use on the Mood products. Although there were some delays it does not appear that Mood was ever prevented from marketing its products by any delays or failures to ABMG to provide artwork or logos. Rather, Mood stopped selling its products because they had fallen out of favor with consumers and the business had become unprofitable.

It is undisputed that ABMG stopped attending trade shows with its licensees after the summer 2010 Magic show in Las Vegas. At the time the License Agreement was executed in late 2008, Audigier products were "hot" and the parties no doubt discussed Audigier's participation at trade shows with its licensees as a vehicle to promote sales. However, there is no provision in the License Agreement obligating ABMG to participate in such shows throughout the term of the agreement.

The License Agreement does require Mood to pay an advertising royalty of 5% of net sales (Ex. 6, ¶ S.15), thereby contemplating that ABMG would in some manner advertise the

---

[6] Perez testified that the names of the Franch lawyer was "Counsel Naim." However, there was no declaration or other documentary evidence of any advice or opinion of a French lawyer on any subject relevant to the arbitration.

Audigier brand and Mood's licensed products.[7] However, there are no express provisions in the License Agreement obligating ABMG to provide any specific amount or manner of advertising, or to attend trade shows. The evidence showed that in 2011 and beyond ABMG's advertising of its brand and licensed products fell off markedly. However, the evidence was unclear whether this fall off *caused* a decline in sales, or whether it was a *reaction* by ABMG to a decline in popularity of the Audigier brand in the marketplace.[8] Similarly, it cannot be concluded from the evidence that any greater expenditures by ABMG on advertising and promotion in 2011 and beyond would have resulted in substantially increased sales by Mood. ABMG had a common interest with its licensees in stimulating sales and could be expected to make advertising and promotion decision to maximize total sales by the licensee group. The arbitrator finds that any decline in advertising by AMBG was not a material breach of the License Agreement.

Similarly, there is no obligation in the License Agreement for ABMG to purchase any certain quantity—or any quantity—of Mood products from Mood. ABMG's decision to reduce purchasing, or to request discount prices, was within its contractual rights and, again, appeared to result from a decline in overall market interest in Audigier branded products.

Mood also contends that Guez's *motivation* for causing ABMG to bring this arbitration is revenge against Perez for her August 2010 refusal in to testify on Guez's behalf in the *Kraif v. Guez* federal court lawsuit. The arbitrator is not persuaded this was Guez's motivation. After Guez and Kraif had their falling out in September *2009* Guez remained on good terms with Perez throughout the next year. And after Perez's August 2010 refusal to testify for Guez,[9] ABMG and Mood continued to do business for the next year without incident. Most importantly, if ABMG had a valid breach of contract claim, as found by the arbitrator, Guez's *motivation* in pursuing that claim is not relevant, nor does it provide Mood with a defense to ABMG's claims.

### D. Damages

ABMG seeks damages for breach of contract in the amount of $773,935.89. That amount is derived by taking the total amount of guaranteed minimum royalties in the License Agreement, and crediting Mood with all earned royalties paid to ABMG and the sum of $76,792.52 owed by ABMG to Mood for products purchased by not paid for by ABMG. See Exs. 41, 42.

On the assumption that minimum royalties are recoverable, Mood makes two other objections to this damages calculation: (i) that it should be reduced by the $125,000 amount contained in the Settlement Agreement for the *Kraif v. Guez* lawsuit (Ex. 563); and (ii) that an

---

[7] Paragraph 14, the long form license agreement (Ex. 5) is headed "Advertising and Trade Shows." It provides that the 5% advertising royalty is "for purposes of advertising and promotion of the image of the Licensed Marks and Licensor Properties." It also provides that the licensee [Mood] "shall also sue its best efforts to Advertise and promote the Licensed Products throughout the Territory at its own cost and expense." The only express obligations in paragraph 14 are those of Mood, as licensee, not of the licensor.

[8] Kraif knew from experience how risky the apparel business can be where, because demand for apparel can fluctuate dramatically. Tr. 1394-1396. Kraif testified he warned Perez of these risks but she was determined to go ahead with the license. Tr. 1997.

[9] Guez testified that he made the request for Perez's testimony, but never had any expectation that she would testify against her husband.

additional credit should be given for the $300,000 in license fee and first year royalty allegedly paid to ABMG by Guez. The arbitrator concludes that the damages amount should be reduced by the first item, but not the second.

Section 2 of the Settlement Agreement is entitled "Amounts Allegedly Owed by Mood to Audigier Brand Management" and provides:

> "In the event that Audigier Brand Management Group, LLC ("Audigier") pursues claims against Mood Signatures, Inc. ("Mood") for alleged licensing fees owed to Audigier by Mood, Audigier agrees that any finding of liability against Mood, if any, shall be reduced by the sum of $125,000 as a result of this Agreement."

The arbitrator agrees with Mood that the term "licensing fees" as used in this paragraph was intended to include royalties (both earned and guaranteed) and is not limited, as contended by ABMG, to the $300,000 in first year royalties ($100,000) and license fee (Ex. 5, ¶4.11), sometimes referred to as "key money."

The arbitrator finds that the even if the $300,000 amount was paid by Guez to ABMG, as a matter of contractual interpretation that should not reduce Mood's liability for the damages set forth in the above-described calculation.

Giving effect to the $125,000 credit, the amount of ABMG's damages awarded hereby is $648,935.89.

## II.   AGBM's Trademark Infringement Claim

The License Agreement placed certain restrictions on Mood's sales of licensed products to third party distributors. Ex. 5, ¶¶ 6.2.2, 6.2.3. Even assuming that ABMG did not know of or approve of any sales of Audigier-branded merchandise by Mood to Coutures, the arbitrator finds that any such sales to Coutures did not amount to actionable trademark infringement. There was no evidence of any customer confusion, or likelihood of confusion, respecting any transactions with or by Coutures. Moreover, Coutures, an entity wholly owned and controlled by Perez, should not be treated as an independent distributor for trademark infringement purposes. As found above, Mood breached its contract by its unreported sales to Coutures. The contractual damages awarded hereby is a sufficient and appropriate remedy for these breaches, and the arbitrator finds against ABMG on its trademark infringement claim.

### A.   Mood's Counterclaim

Mood's counterclaim for unpaid purchase price for goods purchased by ABMG from Mood is denied. Mood's alleged damages are taken into account as an offset to reduce the damages claims by ABMG.

Dated: December 13, 2013

_____
Richard R. Mainland, Arbitrator